Good morning. Good morning, your honors. May it please the court, my name is Catherine Windsor and I represent the appellant in this case, Dr. Firempong. We raised four claims in our brief but I thought I'd focus on the first two unless the court wants to proceed differently and I'd like to reserve three minutes as well. Sure. Well before we begin, I'm a little confused. Can you tell me which exceptions or exceptions under Rule 404B you are arguing apply to Owen's testimony. Trial counsel focused on the plan exception and appeal counsel focused on a mistaken identity. What are you focusing on? Well I really do think it fits under both of them. The identity exception is where you say I didn't do it, this other guy did it, this is who did it and in this case we were saying the billing and management companies but honestly this was a scheme that was ongoing. The other doctors relationship with the companies occurred in mid-2008 just like Dr. Firempong did. There were actually two trial counsel and at trial the government cited the reverse 404B case and those cases focus on identity and so in my opening brief I also in distinguishing them focus on identity. Didn't you waive the plan exception by not raising it in your opening brief? No. Well there are two different exceptions and you didn't argue it in your opening brief and I think whatever you call it. No, it's two different things. It is, there are two different exceptions but essentially what we are saying is that Dr. Firempong had the right to say I didn't do it, this is who did do it, this is how it happened. So I would call that identity I think if you want to call it common plan or scheme that's really another way of saying the same thing in this case. It's not. It's two different exceptions and you argued you went off on clearly on the mistaken identity. Well I was in my opening brief I addressed those cases that had been that the district court had relied on really that wasn't the focus of the district court. Courts holding what the district court really was focusing on was rule 401 and rule 403 and the district court was saying this is going to open up a can of worms we're going to have to have a mini trial but I what I'm thinking stepping back from the which exception it fits into this is a case where the district court really took the minutiae of the rules of evidence of a very of an unusual application of rule 404 B to preclude Dr. Firempong for putting on from putting on a witness that was he was you really his his testimony was was was critical to how the case was going to be decided from the jury's perspective. It was either you believe him or you don't believe him and he had another witness who could say look the same thing happened to me. Now I think that fits well under the identity exception which is how this court has addressed those reverse 404 B issues. So you know I think even if I did waive that it fits under identity as well and it really is the core constitutional element of the Sixth Amendment that are assuming that you're incorrect in that. Where in your brief did you refer to the plan exception? Well I really and in my opening brief I don't believe that I did refer to the plan. You didn't find it but if you you can tell me where it is I'll look for it. No I don't believe it I don't believe it's there. Haven't you waived it? Well if I have waived it it fits under identity because what he was saying was that I didn't do it the billing companies SIREN and HB Financial they were the ones who who did it and that's. So if that was the theory for getting Dr. Owens evidence in isn't that only propensity evidence? I mean isn't it only to show that HP and SIREN did this before so they did it again and that's why it's not him? Yes it is saying that they did it at the same time they were doing it with this other doctor and so it is an other act it's the exception to the. But it's propensity evidence it's not that's not admissible. Well it is admissible if it goes toward identity to say that that he was tricked and that that they were the ones who had actually perpetrated the fraud. But I but the Supreme Court has really said to take these rules of evidence and to use them to preclude the Sixth Amendment constitutional right to put on your defense to really do what what is the core thing and in this case where the government was able to to introduce all of these other claims to really tell the full story of the part of the scheme that they wanted to tell and then not to allow Dr. Firampong to call this witness who had exactly I mean with a few minor differences in the type of test but essentially the same relationship with the billing companies as well. Counsel even if the court could have allowed Dr. Owens to testify under 404-1 why was it an abuse of discretion to preclude that testimony under 403 given that Dr. Owens had no insight into what had happened in this particular case could offer nothing directly and instead we'd have a mini side trial on her whole experience and you know obviously the purposes of rule 403 is you know it's undue prejudice and taking up too much time and distracting the jury from the case at hand. It really wasn't that complicated her story and I think it was more complicated in the district court's mind because Dr. Owens didn't know his situation and the story of what had happened to him. But really it is true they didn't know each other they didn't the two doctors didn't have any interaction but they had the same relationship with those the management company and the billing company and so you know juries are smart they can listen to that evidence and I'm sure the government would have impeached her made she probably would have been appointed a lawyer to consult with as well it's hard to say how it all would have played out but to just tell the defense you can't even call this witness you can't even try to put on this this evidence that is crucial corroborating evidence to the defense to because this is a situation where most juries aren't going to know any jurors are not going to know anything about how medical billing works and that a doctor could be focused on the medical part of what he's doing and not be paying attention to the billing but that and that it I think the other thing that was unusual in this case was that he was reading the test or just in certain in certain cases he was available for consultation but he wasn't actually performing the test and she had that that exact same relationship which is not something that the average person would have been familiar with and to have another doctor telling that same story would have been critical for him to present his defense. Let me ask you a practical question that I've been concerned about. He was sentenced to 57 months for this charge is that right? Yes. And he's already serving 324 months on unrelated charges? Yes. And those charges are done deal they're already final? Yes. Does this have any practical effect on him whatsoever one way or the other? I may be filing a habeas petition in the Sixth Circuit case but unless that ends up being successful and I don't know. Maybe he'll walk a little taller in the main yard or something but this is he's not getting out of prison any any sooner? Correct. I think it is important to him in terms of his his identity as a doctor and you know I will certainly would say that this this case is important to him personally in terms of how it affects his day-to-day existence it may not affect it. But the sentence is not affected? The sentence is not affected. I mean his time behind bars is not affected? Yes. He received a very long sentence in that Michigan case. Can you address the probative value of Owen's testimony and whether it is substantially outweighed by the problem of jury confusion? Yes. Well the the similarities in these relationships were are high and there are a few little differences but in essence the probative value was extremely compelling in terms of putting on his defense. The danger of waste of time and confusion of the issues I think I think that's the sort of thing that the jury would have been able to sort out that they could have I'm sure the prosecutor would have examined her but it's not all that complicated in terms of whether she was also tricked by these same billing companies and what the differences are. It was one witness this wasn't you know it wasn't an incredibly long trial and it really was just whether you believed his story of how how this had gone down with the billing companies. Was there any indication of if you had called your your trial colleague called Dr. Owens what the government would have done in response? Did they say okay you call Owens we're gonna have to call somebody else? Was there any of that? No I'm not aware of that at all. I don't think there's anything in the record about what would have happened. Or how long the testimony would take anything like that? Precisely I mean her interview was 90 minutes but that was a long interview where they were you know looking through files and and that sort of thing. I can turn to the other the second issue if you'd like me to reserve my time. It's your dime. Okay well the second issue is the theory of the defense instruction and what I'd just like to say about that is that what makes this different from the other good faith cases is that that there was all this evidence about his violating Medicare regulations and so there was there was evidence that he had been informed of these Medicare regulations and then these Medicare fraud investigate fraud investigator and another administrator testified saying we looked at the case we determined there was an overpayment we determined that he had incorrectly done this and that he violated these various regulations and the jury then was left with this testimony of somebody who's really knowledgeable about Medicare who's very familiar with the case and how these regulations work and she had determined that he had violated these regulations and so for that reason the how to deal with that and and the burden of proof and whether that's enough to meet the the mens rea in the case. Thank you Ms. Windsor. Good morning your honors. May I please report? Kristen Williams, United States. I will like like the defendants counsel start with the issue of Dr. Owens's testimony and I think some of the court's questions got to one of the issues in this case which is this notion of what was the evidence actually being offered for and under what theory and did the district court have an opportunity to really interrogate that theory at the time. Now had it been offered at that time under the identity theory then I think the question would have been an analysis as it typically is under identity which is there is a single crime with a specific and distinctive modus operandi and one of two people could have done it and the defendant on trial is pointing to the other defendant saying they've done something in a substantially distinctive way in the past therefore they must have done this not me. That's not this case. This is not the case but had that argument been made I think the court would have interrogated it in that way more and I think would have also properly excluded it as it did here under the three separate grounds as it being irrelevant as it being improper 404B as it being time-consuming and confusing under 403. Now I think at bottom what the defendant was trying to use Dr. Owens's testimony for was to put on evidence of Dr. Owens's state of mind in order to show what the defendant's state of mind was because the state of mind was what was really at issue in this case. Wasn't he wasn't he trying to show and he may have done it in a ham-handed way maybe he didn't preserve it I don't know but isn't he trying to say look they they tricked me and not only that they tricked this other doctor too. But I think I think that goes back to the using someone else's state of mind to show. Whatever you call it why wouldn't that be admissible look they they hid drugs in my trunk and you don't have to take my word for it they hid drugs in the other guy's trunk too. Well I think there's several problems so let me just see if I can unpack that here. So the first off is that the only way you and it's not clear from from her interview that she could make that leap. For example she didn't interact with HB Financial directly there were much that she didn't seem to know about or have been asked about at the time. But if we assume that the defendants proffer as to what she would have said that she had this arrangement and then later found out that it was false. Assuming that that was the the situation again you're relying on her state of mind with respect to that arrangement. Why is it state of mind she's saying I got I got they they did false billing under my name it's not my state of mind that's what she would get up there and say. Well I think but the issue of whether they did false billing is I think largely undisputed. The issue is whether the defendant knew that they did. Okay if she says they did it without my knowledge and consent why why wouldn't that help bolster his story that they also billed under his name without his knowledge and admit that you are essentially saying that her state of mind and how she arrived at that state of mind is analogous to the defendants over here and I think there are whereas the defense counsel said that they were some differences but not significant. I think the differences are not only more than some but are significant in terms of the intent that's being asked for. So for example that the evidence of Dr. Firampong's intent and knowledge that he was evicted from clinics at the time that the alleged services took place. No idea whether that's present in Dr. Owens doesn't appear to be it seems like she was at her clinic at the time. He didn't actually perform or interpret any of the NCVs. That again unlike Dr. Owens. Dr. Owens was a radiologist. Radiologists typically perform tests or typically interpret tests not perform them. That's like saying you know in my drug smuggling case where the guy says you know they hid drugs in my car and be knowns to me and you'd get up and say well yeah but yours was a Chevy and they had a Ford. Okay I mean what difference does it make whether she's a neurologist or a radiologist or whatever it is the point she's made with the point he's trying to establish is that these billing people pulled a fast one on him just like they pulled a fast one on her. Now you can you can argue to the jury why you know why that is or isn't a valid defense but I'm having a hard time understanding why that wouldn't be relevant to bolster his story. Let me see if I can explain it this way. So if and this sort of goes to another one of the questions that your honor had about what would the government have done if Dr. Owens' testimony had been put on. So there would have been a couple of things. The first is that the government would have would have impeached her credibility. Now Dr. Owens was being investigated by the government for her complicity in Medicare fraud. That much is apparent from the record that if she was under investigation that's how this came to light. And so the government because she would by taking the stand be putting at issue her credibility with respect to what she says her state of mind was with respect to this different arrangement she had with HB Financial and SIREN. The government would be impeaching that to show that she did in fact know what was going on. Then the government could also. Did you tell did you tell Judge Pease who you would call to do that? I don't recall that if we were asked that particular question and I would also note that at the time although it appears that on appeal defendant has narrowed what he wanted to do. At the time what defense counsel proposed to the court was to put on Dr. Owens. It was to recall Julie Hartman from Safeguard Services to talk about her What I'm asking you is did you did you tell Judge Pease what you would do if they called Dr. Owens? Aside from the general point of saying that we would have to interrogate that no I don't think we did. I'm at a loss to understand how Judge Pease could have found it would have consumed a lot of time if he didn't know what you were what you had up your sleeve. Well I think the point that he referred to was the point that I was making there that in terms of rebutting this evidence the government is going to essentially have to put on trial as to whether or not she had the necessary state of mind. State of mind is almost always the sole issue in these health care fraud cases. But you didn't say we were going to call witness A B C or D and this would take two hours each or anything like that? No we did not say that specifically we did make clear the there were between these. Okay that I understand you say she was a radiologist and he was whatever he was a neurologist? He was an internal medicine. I think it goes beyond that. But in terms of Judge Pease finding that this would have consumed a lot of time I don't see where he where he where he got that if you didn't tell him what you were going to have to do. Well I think he was considering the different scheme which I do I disagree on I think it is different. I think. Well whether it's different and whether it would take a lot of time or two different things I'm focusing on how much time this would have taken. And so I think he was thinking about those things what the government would have had to do in response. It is true your honor that we did not specify which particular witnesses we would have had to call or rebuttal. So this idea of a lot of time just sort of came to him without any showing on your part? Well again I think he was thinking about the amount of time it would take to show the differences. And you didn't tell him how much time it would take? I don't think we made a specific. Okay that's what I'm trying to get at. So okay so now we don't really know how much time it would take and the differences are that he was an internal medicine doctor and she's a radiologist. I disagree that that's reducing it. What I think the differences that go to intent which show why one state of mind can't be used to show another person's state of mind is I mean is things like that Dr. Firampong was going to keep 35% of the proceeds for doing nothing. Not seeing the patient, not performing the test, not interpreting the test. She was going to keep 20% a much lower percentage for actually doing something. The thing that a radiologist always does is interpret tests. You also have the other individuals. When he had the opportunity, when Medicare asked him who else might be related to these services, he didn't tell them. And when I asked him that on cross-examination, I asked him why he didn't do that, he said because I don't snitch. There was a considerable amount of evidence going to his knowledge intent that there's no indication in the record that Dr. Owens would have had anything relevant to say on that. In fact her state of mind was based on such a different set of circumstances that it really can't be parallel. And you can think about this as well. I grant you that it was not in the record, but imagine that the government in rebuttal decided to call the other doctor that the defendant mentioned as having a similar arrangement. Again I think it's a different arrangement but also had an arrangement with HB Financial and Syrian and that was Dr. McKillop mentioned in the record. So imagine a defendant in his case puts on Dr. Owens in addition to his own testimony because as it made clear he was going to testify whether or not Dr. Owens testified or not. And to say that she had this arrangement and she was duped by it. You could imagine that the government in rebuttal might want to put on Dr. McKillop, whom it was also investigating for the similar health care fraud, to say she had a similar arrangement with HB Financial and Syrian but she did know about it and she wasn't duped by it. And so you go back and forth with the states of mind of other people when what's at issue was the defendant's state of mind, his unique circumstances that are ancillary to just the issues that Dr. Owens might have been able to testify about. So again I think, Your Honor, that it goes beyond just she's a radiologist and he's an internal practitioner, but to these other things which are different situations, the considerable evidence, as the Court recognized, that was presented regarding knowledge intent payments to HB Financial made through Del Amo Steakhouse, for example, going to his intent as to whether or not this was actually legitimate. No indication that applied to Dr. Owens at all. If I couldn't... You know, going to the time that would take, but couldn't typical trial management tools, such as time limits on witness testimony or jury instruction, eliminate the risk of jury confusion? Well, I don't think it would in this case because of how much would have been needed to have been attacked with respect to the, assuming again that the defendant was correct, that the proffer came in as he expected, to attack that state of mind of Dr. Owens as actually that she wouldn't be credible if she in fact claimed that she had been duped by it. So I think that you would have to go into that, and this is of course aside from the fact that as the Court recognized, she was almost certainly going to need counsel for this. So this was not an issue that was brought up in the pretrial conference, even though the defendant had the evidence at the time, even though the defendant had already essentially chosen the defense because it was sort of forecast in the motions in Lemonade. So it could have been brought up before trial, but instead it was brought up right in the middle of trial. And there is an additional delay that's involved in getting the person counsel, getting that counsel up to speed enough with what the issues would be with respect to her health care fraud and her exposure on it, and then determining whether in light of that she's able to testify to something, some portion of that, whether you still have these other witnesses who are also going to testify would also have to be recalled because at least one of them, Ms. Hartman, had already left, I think you had the Court thinking about all of that thing, again, relying on what the defendant had told it, had told the Court that what he wanted to do, which is to talk to these three people regarding the defendant's state of mind. I see that I'm close to running out of time here, so I do want to move just very quickly to the issue of the jury instruction. This was not, Your Honor, a case of not nodding your eyes and crossing your Ts. It was not, and the district court's factual findings are entitled to deference on this point, a case of whether or not the defendant knew what the regulations were. The issue that he was claiming, or the theory of his defense, was that he was relying on somebody else. He delegated, essentially, some responsibility to somebody else. But that doesn't show that he didn't know what the regulations are. And this wasn't a case of violating a regulation. It was a case about someone who didn't do any services, and yet billed, I think, roughly $900,000 in the span of six months for them, of which he kept 30%, $300,000, which is, again, not a bad take when you haven't essentially done anything. In his defense to that was what? His defense, I'm sorry, to which point? His defense to doing what you just said was what? His defense appeared to be that he relied on other people that he thought services had been performed. He essentially outsourced. And that was the defense he made, and the jury found it not to be credible, likely in large part because, as the district court recognized, the government's case had primarily focused on the defendant's knowledge and intent, had provided a lot of evidence related to that separate from these arrangements, which the arrangements weren't really in dispute. The government had presented knowledge or evidence of the payments between the two entities, or the entities. If I just make... I see I'm just about to run out of time. So with respect to the instruction, a WAD clearly controls, I think, that that's not required, in this case, properly instructed that the intent to deceive and cheat and what the willfulness were, which are completely inconsistent with the good faith. Thank you very much, Ms. Williams. Ms. Windsor? Thank you. I just have a couple of points. The first is just to note that in the district court, when this issue was first raised, the reverse 404B cases were cited by the government, and the district court certainly used that as sort of his third reason to exclude them. But really, the focus was on 401 and 403. But ultimately, he held that it wasn't even relevant to the case. Exactly. The proffer wasn't relevant to this case. Yes. He focused on... I mean, really, his concern was that it wasn't relevant, that first, Dr. Phirampong would have to show that he had been tricked, and then bring in this other witness to... And at that point, he hadn't testified, so he hadn't shown that he'd been tricked, and then bring in this other witness and show that she'd also been tricked. And so he felt it wasn't relevant, and the 403 concerns. In terms of when this was all raised, the record shows that the government turned over this recording to the defense one to two weeks before trial, and the defense had put her on its witness list that they handed to the government. And it was at that point that... Which may have been in trial, or close to the time of the start of trial, when the government raised it in court. And then, finally, just that... To clarify that, although the government really winnowed down these claims, so that there were these five counts, although there were hundreds of other claims that they also brought in, and those five claims involved the NCV tests, which were tests where Dr. Phirampong was available for consultation, but didn't actually read the reports. But a lot of the cases concerned sleep studies, and in those, he had a very similar role to Dr. Owens, where he was actually reading the test results and writing the reports. And those... So in that... When you look at the whole scheme, certainly, he had a very similar role to Dr. Owens. And if there's anything else... I guess not. Thank you, Ms. Williams. Thank you, too. The case just argued is submitted, and we'll stand in recess. Thank you.
judges: Nelson, Silverman, Wardlaw